**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **VICTORIA BORDELON**, | Case No. 3:20-CV-02037-IM |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **AIRGAS USA, LLC**; and **FRANK DOHERTY**, an individual, | |
| Defendants. | |

Matthew S. Kirkpatrick, Kirkpatrick Law, LLC, 7505 SE 18th Street, Portland, OR 97202; Robert Le, The Law Office of Robert Le, 826 SE 3rd Avenue, Suite 302, Portland, OR 97214. Attorneys for Plaintiff.

Nancy M. Erfle and W. Gregory Lockwood, Gordon Rees Scully Mansukhani, LLP, 1300 SW Fifth Avenue, Suite 2000, Portland, OR 97201. Attorneys for Defendants.

**IMMERGUT, District Judge.**

This matter comes before this Court on Airgas USA, LLC's and Frank Doherty's (collectively, "Defendants") Motion for Summary Judgment, ECF 24, and Motion to Strike, ECF 26. Plaintiff, Victoria Bordelon, in response, ECF 28, also makes a Motion to Strike. This Court heard argument on these motions on April 15, 2022. ECF 38. For the reasons set forth below, Defendants' Motion for Summary Judgment, ECF 24, is DENIED. This Court DENIES Defendants' Motion to Strike the expert testimony of Dr. Kirkpatrick and DEFERS ruling as to

the expert testimony of Dr. Milam. ECF 26. This Court DENIES Plaintiff's Motion to Strike the

expert testimony of Mr. Stephens. ECF 28.

**STANDARDS**

**A. Summary Judgment**

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view the

evidence in the light most favorable to the non-movant and draw all reasonable inferences in the

non-movant's favor. *Clicks Billiards*, 251 F.3d at 1257.

Although "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a

motion for summary judgment," the "mere existence of a scintilla of evidence in support of the

[non-movant's] position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

"The evidence presented by the parties must be admissible." *Wady v. Provident Life &*

*Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1065 (C.D. Cal. 2002) (citing Fed. R. Civ. P.

56(e)). Further, the non-moving party may not rest on conclusory or speculative evidence but

rather must "set forth specific facts in support of [its] . . . theory." *Thornhill Pub. Co., Inc. v.*

*Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

Federal courts sitting in diversity apply substantive state law. *Erie R.R. Co. v. Tompkins*,

304 U.S. 64, 80 (1938). When applying state law, a federal court is bound by the decisions of the

state's highest court. *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001). If the state's highest court has not yet squarely addressed a question, the federal court must predict how the state court would resolve it. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986). A federal court will follow the decisions of a state's intermediate appellate courts, unless there is convincing evidence that the state supreme court would decide differently. *Id.* If the state's appellate courts have not yet reached the issue, the federal court may consider other non-precedential state decisions, treatises, and well-reasoned authority from other jurisdictions. *Id.*

## B.  Admissibility of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Under *Daubert*[1] and its progeny, including *Daubert II*[2], a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969 (9th Cir.

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995).

2013)). The trial court serves as "a gatekeeper, not a fact finder." *Primiano v. Cook,* 598 F.3d 558, 565 (9th Cir. 2010) (internal quotation marks and citation omitted); *see also Alaska Rent-A-Car*, 738 F.3d at 969–70 ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

Before admitting expert testimony into evidence, district court judges must determine whether the evidence is reliable and relevant under Rule 702. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565 (internal quotation marks and citation omitted). "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id*.

Determinations of the reliability of scientific expert testimony are guided by the factors outlined by the Supreme Court in *Daubert*. *See Daubert*, 509 U.S. at 593–95 (outlining the non-exclusive factors of general acceptance in the scientific community, peer review and publication, testability, and error rate). Courts have recognized that this inquiry is flexible, and that these factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying *Daubert* to non-scientific expert testimony); *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (explaining that when evaluating non-scientific expert testimony, the district court "may consider the specific

factors identified in *Daubert* where they are reasonable measures of the reliability of proffered

expert testimony," but is not bound to "mechanically apply the *Daubert* factors").

## BACKGROUND

Defendant Doherty was employed as a truck driver for Defendant Airgas. ECF 25-1, Ex.

A, at 4. On October 22, 2018, Doherty was driving a truck owned by Airgas containing carbon

dioxide. *Id*. at 4, 6–7. While driving northbound on Interstate 5 ("I-5") near the Marquam Bridge

in Portland, Oregon, the truck driven by Doherty collided with Plaintiff's Volkswagen Passat and

multiple other vehicles, and rolled onto its side. *Id*. at 52–54; ECF 25-3, Ex. C, at 2–3, 33–36;

ECF 20, Bordelon Decl., at ¶¶ 3–4. According to police reports, "[s]everal civili[ans] had

help[ed] get [Doherty] out of the truck" and he was lying "face down in the grass." ECF 25-3,

Ex. C, at 32; *see also id.* at 37. Police officers at the scene referred to Doherty as "conscious but

confused and disoriented" following the collision, and "unsteady on his feet and confused of

where he was and what had happened." *Id*. at 32–33; *see also id*. at 37. Doherty was "turned . . .

over to medical" by the officers. *Id*. at 37. He was then examined and treated at Oregon Health &

Science University ("OHSU") Hospital. *See generally* ECF 25-5, Ex. E.

At the scene, Plaintiff spoke to a police officer and reported that she was "not sure if

[Doherty] was having a medical emergency or had non-working brakes." ECF 25-3, Ex. C, at 35.

According to the police report, she "elected to be transported to the hospital, but her injuries

were non-trauma and not life threatening." *Id*. Following the collision, Plaintiff reported pain in

her neck and left arm. *See* ECF 25-9, Ex. I, at 3 (reporting such pain during deposition); ECF 25-

7, Ex. G, at 4 (noting by ambulance paramedic complaints of neck pain and left arm soreness);

ECF 25-8, Ex. H, at 2 (noting by emergency room physician complaints of "pain to her upper

neck," "mild soreness to the left anterior chest, no other areas of pain," and that "[s]he did not hit

her head"); ECF 29, Bordelon Decl., at ¶¶ 5–6 (noting left shoulder and arm pain and neck pain).

**DISCUSSION**

Defendants now move for summary judgment. They contend that "there is no evidence that Doherty acted unreasonably in light of a foreseeable risk." ECF 24 at 7. In the alternative, they move for partial summary judgment, arguing that "[t]he undisputed evidence shows that Plaintiff never suffered a concussion in the crash and any shoulder injuries are unrelated to the accident." *Id*. Additionally, Defendants move to strike the opinions of Plaintiff's experts Ryan Kirkpatrick, M.D., and Bryce Milam, D.C. ECF 26. In response, Plaintiff "moves to strike all of [Defendants' expert, Gregory Stephens's] opinions related to or regarding Doherty's medical condition." ECF 28 at 5. This Court first addresses the evidentiary issues, then proceeds to address the Motion for Summary Judgment.

**A.  Dr. Ryan Kirkpatrick**

Since 2005, Dr. Kirkpatrick has worked as an Attending Physician at Salem Hospital Emergency Department. ECF 27-2, Ex. B, at 5. He graduated from OHSU with a medical degree in 2001 and completed a residency in emergency medicine at the University of Arizona in 2004. *Id*. Following his residency, he worked as an Attending Physician in the Emergency Department of Carondelet St. Joseph's and St. Mary's Hospitals in Arizona, and a Medical Director of Chemeketa Community College EMS Programs. *Id*. Dr. Kirkpatrick prepared an expert report for Plaintiff dated October 13, 2021. *Id*. at 4. Based on his "review of the records," including the OHSU Hospital records and Doherty's deposition, and "knowledge, training, and experience," Dr. Kirkpatrick opined that Doherty "did not lose control of the vehicle he was operating due to any medical condition but most likely due to falling asleep." *Id*. at 2. He opined that "Doherty did not experience a syncopal episode," and that his condition "is more accurately described simply as a loss of consciousness." *Id*. Dr. Kirkpatrick concluded that though loss of consciousness can occur for many reasons, based on a lack of evidence supporting a medical

condition, a review of the records, and his experience and training, "Doherty fell asleep at the wheel." *Id*. at 3.

Defendants seek to exclude the opinions of Dr. Kirkpatrick "in their entirety." ECF 26 at 4. Defendants argue, among other things, that his opinion that Doherty fell asleep while driving is "speculative and unsupported," and "not founded upon any admissible facts, scientific data, or proper methodology." *Id*. at 6–7. And they contend that Dr. Kirkpatrick's opinion that Doherty did not have a syncope event (*i.e.*, faint[3]) is "speculative" and "not grounded in any scientific methodology." *Id*. at 10. Accordingly, Defendants assert that his opinions should be excluded as unreliable and unsupported by facts or methodology. *See id*. at 12.[4]

"Testimony by physicians may or may not be scientific evidence like the epidemiologic testimony at issue in *Daubert*." *Primiano*, 598 F.3d at 565 (noting "much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively" and "physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties" (internal quotation marks and citation omitted)). The Ninth Circuit has explained that "[a] trial court should admit medical expert testimony if physicians would accept it as useful and reliable." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). So long as the "foundation is sufficient," the jury, rather than the judge, appropriately determines the medical expert's credibility. *Primiano*, 598 F.3d at 566. In this case, given the nature of the issue, Dr. Kirkpatrick's expertise, and subject of the testimony, this Court

---

[3] Syncope is defined as a "loss of consciousness resulting from insufficient blood flow to the brain," or, in common terms, fainting. *See* Syncope, Merriam-Webster, https://www.merriam-webster.com/dictionary/syncope.

[4] Though Defendants note that Dr. Kirkpatrick is the cousin of Plaintiff's counsel, *see id*. at 2; ECF 35 at 6, Defendants do not make any argument that Dr. Kirkpatrick should be excluded because of his relationship to counsel.

focuses on whether Dr. Kirkpatrick's qualifications are sufficient, whether his testimony is

helpful, and whether his method—differential diagnosis—is reliable under the standard set forth

in *Daubert*. *See Kumho Tire Co.*, 526 U.S. at 150, 152.

Defendants argue that Dr. Kirkpatrick lacks sufficient qualifications under Rule 702. ECF

26 at 5–6. This Court disagrees. Defendants note that Dr. Kirkpatrick "is not a neurologist,

cardiologist, sleep specialist, or any type of specialist in a relevant medical field," nor is he an

"accident reconstructionist, human factors expert, or driving expert." *Id*. The Ninth Circuit has

explained—and Defendants have cited no binding authority stating otherwise—that "[o]rdinarily,

courts impose no requirement that an expert be a specialist in a given field, although there may

be a requirement that he or she be of a certain profession, such as a doctor." *Doe v. Cutter

Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992); *see also id*. at 385 n.11 ("Licensure in the

discipline or speciality which is the subject of expert opinion is not a requirement under the

Federal Rules of Evidence."). As noted above, Dr. Kirkpatrick has substantial experience as an

emergency room physician, including treating patients after motor vehicle collisions and who

have experienced loss of consciousness. *See* ECF 27-2, Ex. B, at 2. That Dr. Kirkpatrick is not a

specialist in a certain field goes to weight, not admissibility, and "it does not make his [opinion]

per se inadmissible at summary judgment." *Smith v. Nw. Permanente, P.C.*, No. 3:12-cv-00259-

HZ, 2013 WL 3973818, at *5 (D. Or. July 30, 2013).

As to Defendants' contention that this Court should find that Dr. Kirkpatrick's opinion is

not helpful, ECF 26 at 4–5, this Court is not also persuaded. Rule 702 requires the court to

determine whether the expert's knowledge "will help" the trier of fact. Fed. R. Evid. 702(a).

"The 'will assist' requirement, under *Daubert*, 'goes primarily to relevance.'" *Primiano*, 598

F.3d at 567 (quoting *Daubert*, 509 U.S. at 591); *see also United States v. Finley*, 301 F.3d 1000,

1013 (9th Cir. 2002) (explaining that courts "must be cautious not to overstate the scope of the

average juror's common understanding and knowledge" and that "case law recognizes the

importance of expert testimony when an issue appears to be within the parameters of a

layperson's common sense, but in actuality, is beyond their knowledge"). Relevance is

determined by the underlying claims and what must be proved. Here, Plaintiff brings a

negligence claim. *See* ECF 1-1, Ex. 1, at ¶¶ 6–14. Under Oregon law, "when a claim for

common-law negligence is premised on general principles of foreseeability, the plaintiff must

plead and prove that the defendant's conduct created a foreseeable and unreasonable risk of

legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to

the plaintiff." *Chapman v. Mayfield*, 358 Or. 196, 205 (2015). Whether or not Doherty

experienced a foreseeable medical event preceding the collision is relevant to the claims. And

Dr. Kirkpatrick's opinions are helpful to the trier of fact. Dr. Kirkpatrick's opines based on a

review of medical records and his differential diagnosis; such medical analyses are likely to be

beyond the parameters of a layperson's knowledge.

Defendants' contentions that Dr. Kirkpatrick's opinions are unsupported, too speculative,

and without sufficient methodology, ECF 26 at 6–12, require greater scrutiny. Defendants argue

that Dr. Kirkpatrick's opinions are flawed because he did not personally examine Doherty or

speak to witnesses or examining doctors, and "is, in effect offering a differential diagnosis." ECF

26 at 6–7. Plaintiff responds that his "opinions are based on a thorough differential diagnosis and

are well-supported by his education, experience, and cited authorities." ECF 28 at 10.

A medical expert "certainly may rely on his own clinical experience in stating his

opinion." *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1138 (D. Or. 2010); *see also*

*Primiano*, 598 F.3d at 565 (noting "physicians must use their knowledge and experience as a

basis for weighing known factors along with the inevitable uncertainties to mak[e] a sound judgment" (internal quotation marks and citation omitted)). Here, Dr. Kirkpatrick explained that he relied, in part, on his training and experience—which as explained above are significant—in coming to his conclusions. *See* ECF 27-2, Ex. B, at 2. Moreover, a medical expert need not necessarily examine an individual in order to offer an opinion. *Primiano*, 598 F.3d at 567.

A differential diagnosis, too, can form the basis for an expert opinion. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003) ("Differential diagnosis[5] is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*."). "When an expert rules out a potential cause in the course of a differential diagnosis, the 'expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) (quoting *Clausen,* 339 F.3d at 1058).

---

[5] As the Ninth Circuit described:

> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

*Id*. (internal quotation marks omitted) (quoting *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir. 1999)).

In this case, Dr. Kirkpatrick identified possible medical causes for Doherty's loss of control of the truck preceding the collision at issue in this case. *See* ECF 27-2, Ex. B, at 2. He considered syncope, but rejected it, because "[t]here is nothing in [Doherty's] history or medical evaluation to suggest that syncope occurred." *Id*. He explained that syncope is "typically preceded by a prodrome of symptoms," such as "lightheadedness often accompanied by cold sweats and nausea," and while it "can occur without a prodrome, as in cases with sudden cardiac arrhythmia," "there is no evidence to suggest this is what [Doherty] experienced." *Id*. He further noted it is "very unusual for syncope to occur in a patient while seated, without trigger, and no prodrome." *Id*. at 3. Dr. Kirkpatrick also considered, and ruled out, a migraine headache or seizure, based on Doherty's report of "seeing some unusual lights" prior to the collision. *Id*. Dr. Kirkpatrick noted that Doherty had no history of migraine, and that migraine does not lead to loss of consciousness. As to a seizure, he found "no evidence" based on "no history of seizure," no description of "an abnormal cognitive state" following his loss of consciousness, and "his medical evaluation shows none of the lab abnormalities seen with a seizure." *Id*. Additionally, Dr. Kirkpatrick noted that seizures cause unconsciousness for one to two minutes, not a matter of seconds. *Id*.

Dr. Kirkpatrick considered sleep as the cause of Doherty's loss of consciousness, and opined that Doherty "fell asleep at the wheel." *Id*. Dr. Kirkpatrick cited Doherty's "multiple risk factors for falling asleep while driving." *Id*. Based on the fact that Doherty "woke up at 4 am," Dr. Kirkpatrick concluded it is "reasonable to assume that he was sleep deprived." *Id*. He also concluded that Doherty "more likely than not has undiagnosed and untreated obstructive sleep apnea," based on his weight, vitamin D deficiency, and hypertension. *Id*.

While Dr. Kirkpatrick did not personally examine Doherty, and relied only on two pieces of medical literature in coming to his conclusions, *see id.* at 4, Dr. Kirkpatrick "referred to his own extensive clinical experience as the basis for his differential diagnosis, as well as his examination of [Doherty's] records, treatment, and history." *Messick*, 747 F.3d at 1198. The Ninth Circuit has explained that such an analysis provides a sufficient scientific basis for an expert medical opinion and has "recognized the difficulties in establishing certainty in the medical sciences." *Id.* ("Medicine partakes of art as well as science, and there is nothing wrong with a doctor relying on extensive clinical experience when making a differential diagnosis.").

Under *Daubert*, a district court must act as a gatekeeper to exclude "junk science," or expert testimony based only on "[p]ersonal opinion, not science." *Daubert*, 43 F.3d at 1319, 1321 n.18. But as a matter of law, this Court cannot say that say that Dr. Kirkpatrick's opinion is "junk science" and warrants striking for purposes of summary judgment.[6] *See Wendell*, 858 F.3d at 1235 ("The Supreme Court in *Daubert* aimed at screening out unreliable or bogus expert testimony. Nothing in *Daubert*, or its progeny, properly understood, suggests that the most experienced and credentialed doctors in a given field should be barred from testifying based on a differential diagnosis."). The issues Defendants raise properly go to weight, not admissibility. Defendants may cross-examine Dr. Kirkpatrick about weaknesses in his method and opinion, and it may be the case at trial that Defendants' medical expert is more persuasive and that the finder of fact gives Dr. Kirkpatrick's opinion little weight. Nevertheless, this is for the factfinder to

---

[6] In reply, Defendants ask this Court to strike Dr. Kirkpatrick's November 26, 2021 letter, ECF 30-2, Ex. B, on the basis that it is "untimely and outside the scope of [his] prior reports," and therefore contrary to Federal Rules of Civil Procedure 26 and 37. ECF 35 at 2–3. This Court need only consider Dr. Kirkpatrick's initial report to both determine the admissibility of his testimony *and* rule on the motion for summary judgment. Accordingly, this Court defers ruling on whether the November 26, 2021 letter should be stricken. Defendants may file a motion in limine to this effect in advance of trial.

decide at trial, not for this Court to determine at this stage. *See id*. at 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the junk science Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof—to attack[ ] shaky but admissible evidence." (internal quotation marks and citations omitted)); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230–31 (9th Cir. 1998). Accordingly, Defendants' motion to strike is denied.

## B.  Dr. Bryce Milam

As to Dr. Milam, Defendants argue that his "non-chiropractic opinions should be excluded because he does not qualify as an expert." ECF 26 at 12–13. Specifically, Defendants seek to exclude his testimony concerning: Plaintiff's "general health and medical history," Plaintiff's "non-chiropractic complications," "non-chiropractic treatment that may be needed in the future," and causation. *Id*. Plaintiff argues that Dr. Milam is qualified to give expert testimony on these issues based on his training and experience. ECF 28 at 12–14.

As explained below, this Court is able to resolve Defendants' partial motion for summary judgment without ruling on the admissibility of—or considering—Dr. Milam's testimony. Accordingly, this Court declines to rule on the admissibility of this testimony at this stage. Defendants may raise the issue of admissibility again in a *Daubert* motion or motion in limine prior to trial.

## C.  Gregory Stephens

In her response, Plaintiff seeks to exclude the expert opinions of Mr. Stephens for the purposes of summary judgment, "related to or regarding Doherty's medical condition, including" whether Doherty experienced syncope, its duration, whether Doherty would have been able to stop the truck, and whether syncope might have caused the collision. ECF 28 at 4–5. Plaintiff

argues these are medical opinions requiring a medical expert, which Mr. Stephens is not. *Id*. Defendants oppose, arguing that Plaintiff misconstrues Mr. Stephens's testimony because he does not provide medical opinions, and the opinions he does provide are based on "the time and distance of the accident sequence." ECF 33 at 10–11.

Mr. Stephens is a research engineer with over thirty years of experience in collision analysis, accident reconstruction, vehicle crash testing, and related research. ECF 25-4, Ex. D, at 2. He has "analyzed over 2000 automotive-type accidents," "published and presented in various areas related to Accident Reconstruction and Automotive Safety," and has served as an expert in state and federal courts. *Id*.

This Court finds that Mr. Stephen's background, including his knowledge and experience, provide him with the qualifications to opine on matters of accident reconstruction and collision-related matters under Federal Rule of Evidence 702. This Court agrees with Defendants that Mr. Stephens is not providing a medical opinion—which no party asserts he is qualified to do. Mr. Stephens instead noted that, in his experience reconstructing collisions in which the driver has fallen asleep, "the operators are awakened by events like traversing rumble strips, proceeding offroad, [or] impacting vehicles," but that was not the case for Doherty. ECF 25-4, Ex. D, at 9–10. He opined that given his experience with collisions, and considering the distance and time of the collision sequence here, "this collision event is not consistent with a simple 'falling asleep' scenario." *Id*. at 10. This testimony is appropriately within the scope of what Mr. Stephens is qualified to opine on given his knowledge, experience, and training. Accordingly, Plaintiff's motion to strike is denied.

### D. Summary Judgment

#### 1. Foreseeability

Defendants contend that they are entitled to summary judgment as a matter of law because the collision was not foreseeable, such that Defendants cannot be negligent. *See* ECF 24 at 2. As the Oregon Supreme Court has explained:

> Traditionally, the elements of common-law negligence required a plaintiff to plead and prove that the defendant owed [the plaintiff] a duty, that [the] defendant breached that duty, and that the breach was the cause-in-fact of some legally cognizable damage to [the] plaintiff. However, under this court's contemporary jurisprudence, the traditional duty-breach analysis is subsumed in the concept of general foreseeability, unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty. . . . Thus, when a claim for common-law negligence is premised on general principles of foreseeability, the plaintiff must plead and prove that the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff.

*Chapman*, 358 Or. at 205 (internal quotation marks and citations omitted). Foreseeability, which serves "as a limit on the scope of liability," considers "what prospectively might happen" and is separate from causation. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1, 13 (1987) (en banc). "It is not necessary that the risk of harm be more probable than not; rather, the question is whether a reasonable person considering the potential harms that might result from his or her conduct would have reasonably expected the injury to occur." *Chapman*, 358 Or. at 206 (internal quotation marks and citation omitted); *see also Stewart v. Jefferson Plywood Co.*, 255 Or. 603, 609 (1970) ("[T]he community deems a person to be at fault only when the injury caused by him is one which could have been anticipated because there was a reasonable likelihood that it could happen.").

"A dispute in a negligence action about whether an injury was foreseeable generally presents an issue of fact and, therefore, is not a likely candidate for summary judgment." *Giulio v. BV CenterCal, LLC*, No. 3:09-CV-482-AC, 2011 WL 3860443, at *17 (D. Or. Aug. 10, 2011), *report and recommendation adopted,* No. CV 09-482-AC, 2011 WL 3860440 (D. Or. Aug. 31, 2011) (internal quotation marks omitted) (quoting *Cunningham v. Happy Palace, Inc.*, 157 Or. App. 334, 337 (1998)). But "summary judgment is appropriate where 'no reasonable factfinder could find the risk of harm to be reasonably foreseeable.'" *Id*. (quoting *Cunningham*, 157 Or. App. at 337); *see also Chapman*, 358 Or. at 206 ("If, and only if, the court determines that the defendant's conduct clearly falls outside the community's conception of fault, the issue of foreseeability must be withdrawn from the jury."). On summary judgment, then, the question is: "whether plaintiff's injury and the manner of its occurrence was so highly unusual that we can say as a matter of law that a reasonable man, making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur." *Stewart*, 255 Or. at 609.

The evidence in the record shows that on the day before the collision, a Sunday, Doherty "did a run to Boardman, Oregon to pick up CO2 and bring it back to Portland." ECF 25-1, Ex. A, at 5. The run was "normal," but Doherty normally did not work on Sundays. *Id*. On the day of the collision, Doherty woke up around four in the morning and arrived at the Airgas facility slightly after five. *Id*. at 7. He either purchased coffee, or he had brought coffee with him from home. *Id*. at 6. His route involved driving to Eugene, Oregon, to Springfield, Oregon, back to Eugene, and then to Portland. *Id*. at 7; *see also id*. at 8 (describing the route as "a pretty normal run"). Prior to arriving in Portland, he was "pretty sure" that he stopped for a break at a truck stop near Lebanon, Oregon, where he normally took his break. *Id*. at 8. Upon reaching Portland,

while driving close to where a tram which passes over I-5, Doherty noticed he was "seeing the sky differently," and it looked like an "aurora." *Id*. at 9–11. He "continued driving a little bit further," *id*. at 11, and then he found himself "slunched (sic) forward" in the driver's seat, unable to drive normally, *id*. at 12–13. The next thing he remembered was "being awakened up outside of the [truck]." *Id*. at 13. Doherty's truck had collided with about a dozen vehicles along a roughly 2100-foot length stretch of I-5 during this roughly one-minute interval. *See* ECF 25-4, Ex. D, at 5, 9.

Defendants' expert, Dr. Yakovlevitch, reviewed the records related to the collision and noted they "document that Frank Doherty suffered an episode of syncope while driving." ECF 27-5, Ex. E, at 3. He opined that "[e]xperiencing syncope while driving would result in a loss of vehicle control," and "though the loss of consciousness can be brief in duration, a motor vehicle collision is a typical consequence of syncope while driving." *Id*. He opined that Doherty lacked "any pre-existing condition whose nature or magnitude is sufficient to account for his syncope," and that tests conducted following the collision failed to show any factors that would have contributed to his syncope or placed him at greater risk. *Id*. at 4–5. He opined that "Doherty could not have predicted that he was at an increased risk of syncope," "there is no evidence to suggest that Mr. Doherty did anything either actively or though omission to contribute to the episode of syncope," and "even a physician skilled in diagnosis and management of syncope could not have predicted Mr. Doherty's episode of syncope" and "would have cleared [him] to drive a commercial vehicle." *Id*. at 5.

Defendants' expert, Mr. Stephens, reviewed material related to the collision and analyzed the impact sequence. ECF 25-4, Ex. D, at 2. He opined that "[t]he total time for [Doherty's truck] to travel from the first impact with [Plaintiff's vehicle] to final rest was over 60 seconds, over a

distance of at least 0.4 mile[s]." *Id.* at 9. With "normal perception/reaction times and distances[,] the [truck] should have been able to stop within approximately 100 feet," so Mr. Stephens concluded that "[g]iven the extensive distance and numerous impacts that the [truck] underwent, this accident appears to be inconsistent with an operator that was simply inattentive or momentarily asleep." *Id.* (explaining that he "reconstructed numerous collisions that have involved an operator that has fallen asleep" and "[t]ypically, the operators are awakened by events like traversing rumble strips, proceeding offroad, impacting vehicles or roadside objects, etc.").

Even assuming that Defendant suffered a medical event preceding the collision, this Court cannot find as a matter of law that the medical event was unforeseeable on the summary judgment record before it.[7] The Oregon Supreme Court has explained that "an operator of a motor vehicle who, while driving, becomes suddenly stricken by a fainting spell or losses consciousness from an unforeseen cause, and is unable to control the vehicle, is not chargeable with negligence." *van der Hout v. Johnson*, 251 Or. 435, 438 (1968) (internal quotation marks and citation omitted); *see also id.* at 438–39 (explaining that "[t]he reason of the rule . . . applies just as strongly to a case of sudden illness which incapacitates the driver of an automobile as to a case of fainting or unconsciousness"). Nevertheless, the Oregon Supreme Court held, based on the evidence in the record, including prior visits to a doctor regarding chest pain and a diagnosis

---

[7] Plaintiff, in response to the motion for summary judgment, argues that "Defendants fail to establish their medical-emergency defense." ECF 28 at 3. However, this Court understands Defendant's motion to assert that it is *Plaintiff* who cannot meet her burden of showing foreseeability, an element of the negligence claim, *not* that Defendants move on an affirmative defense. *See* ECF 33 at 2. Accordingly, this Court proceeds on its, and Defendants', understanding of the motion, and considers whether at the summary judgment stage, the evidence in the record permits a reasonable juror to find for Plaintiff on the issue of foreseeability.

of early congestive heart failure, that it was a jury question "whether [the driver] had knowledge of a heart condition such that it would have been negligence for him to drive an automobile." *Id*. at 439. The Court explained that, on the evidence presented, "it would have been error for the judge to have instructed the jury that the heart attack which precipitated [the driver's] loss of control of his automobile and the resulting unfortunate injuries to the plaintiff, was foreseeable by [the driver]." *Id*. at 441.

This Court recognizes that there is no evidence in the summary judgment record that Doherty previously visited a doctor regarding syncope or related disorders or that he had any "pre-existing conditions whose nature or magnitude was sufficient to account for his syncope." ECF 25-6, Ex. F, at 4; *see also* ECF 27-2, Ex. B, at 3 ("There is nothing in [Doherty's] history or medical evaluation to suggest that syncope occurred."). Nevertheless, there is evidence in the record that while driving on I-5 prior to the collision, Doherty "was seeing other colors that weren't there" in the sky. ECF 25-1, Ex. A, at 9. He had "never experienced that before," but "continued driving a little bit further"; the collision followed. *Id*. at 9, 11–12. Drawing all reasonable inferences in Plaintiff's favor, a reasonable juror could find the collision and Plaintiff's resultant injuries sufficiently foreseeable, and therefore find Defendants' conduct negligent, based on Doherty seeing things "that weren't there," but continuing to drive on I-5 without pulling over or otherwise taking mitigating action. *See* ECF 28 at 7. Whether the evidence suggesting a foreseeable medical incident is more credible than the evidence suggesting otherwise is a question for the jury, not this Court on summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.").

Additionally, though the record lacks conclusive evidence as to what caused the collision, "[t]here is enough circumstantial evidence to justify an inference that [Doherty] went to sleep at the wheel." *Sheehan v. Apling*, 227 Or. 594, 596 (1961); *see* ECF 27-2, Ex. B; ECF 25-3, Ex. C, at 17 (noting driver factors of "fatigue/drowsy" in police report); ECF 25-1, Ex. A, at 6–8 (noting Doherty worked an unusual schedule the day before the collision and woke up early in the morning on the day of the collision). On these facts, at the summary judgment stage, this Court cannot take the foreseeability determination away from the jury. *See Sheehan*, 227 Or. at 577 (explaining that "the jury should have been given the opportunity to consider [the driver's] negligence" under the circumstances). Defendants argue that "even if Doherty fell asleep . . . that would be insufficient to demonstrate negligence in this case," because "[g]enerally, a [p]laintiff must show that the driver acted negligently by ignoring their fatigue." ECF 24 at 10. But Defendants fail to cite to any controlling Oregon law on this issue. *See id*. Rather it appears that the Oregon courts have not resolved the question of whether "a driver who falls asleep, having no advance warning that he will do so, may nonetheless be found liable for damages for negligence." *See Johnson v. McAdoo*, 74 Or. App. 46, 49 (1985) (noting a "split of authority" on this issue). *Cf. State v. S.N.R.*, 260 Or. App. 728, 736–37 (2014) (explaining the Oregon Supreme Court has held that "[t]o constitute *gross negligence* in falling asleep while driving there must have been such prior warning of the likelihood of sleep that continuing to drive constitutes reckless disregard of consequences" (internal quotation marks and citation omitted) (emphasis added)).

"Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate." *Candow v. Dust*, No. 2:11-CV-00343-LRH, 2012 WL 5944698, at *2 (D. Nev. Nov. 27, 2012) (citing *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983)). Such is the case

here. Foreseeability is normally a question for the jury, and in this case, "the circumstances, although unusual, [are] not 'out of the range within which a jury could determine that the injury was reasonably foreseeable.'" *Piazza v. Kellim*, 360 Or. 58, 75 (2016) (quoting *Stewart*, 255 Or. at 609–10)). Accordingly, summary judgement on the issue of foreseeability is denied.

### 2. Causation

Defendants move, in the alternative, for partial summary judgment "on the issue of causation for [Plaintiff's] alleged shoulder injury and concussion." ECF 24 at 2. Defendants contend that "Plaintiff has failed to prove that her shoulder injury was caused by the accident," *id.* at 11, and that "Plaintiff did not suffer a concussion in the accident," *id.* at 12. As to the alleged shoulder injury, Defendants argue that "[t]he undisputed evidence shows that . . . on the day of the accident no medical professional detected signs of a shoulder injury," and that she first mentioned shoulder pain in January 2019, after engaging in unrelated athletic activities. *Id.* at 11. As to the alleged concussion, Defendants explain that no neurological issues or head trauma were assessed following the collision, Plaintiff denied hitting her head during the collision, and if she did suffer a concussion, it was a month after the collision in November 2018. *Id.* at 12. In response, Plaintiff cites to evidence in the record, including Plaintiff's declaration and medical reports and opinions indicating that she exhibited shoulder pain as well as concussive symptoms following the collision. *See* ECF 28 at 8–9.

"In order to establish causation, a plaintiff must demonstrate a reasonable probability that the alleged conduct caused the alleged harm." *Yeo v. Washington Cnty.*, No. 08-1317-AC, 2011 WL 1118506, at *9 (D. Or. Mar. 24, 2011) (citing *Joshi v. Providence Health Sys. of Or. Corp.*, 198 Or. App. 535, 545 (2005)). "Causation may be proved by circumstantial evidence, expert testimony, or common knowledge." *Two Two v. Fujitec Am., Inc.*, 355 Or. 319, 332 (2014). Under Oregon law, "[n]ot every medical case requires expert testimony to establish . . .

causation." *Chouinard v. Health Ventures*, 179 Or. App. 507, 512 (2002). However, "[w]hen the element of causation involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless the plaintiff has presented expert testimony that there is a reasonable medical probability that the alleged negligence caused the plaintiff's injuries." *Baughman v. Pina*, 200 Or. App. 15, 18 (2005) (citing *Uris v. State Comp. Dep't*, 247 Or. 420, 424 (1967)).[8] "Th[is] rule prevents jurors from speculating about causation in cases where that determination requires expertise beyond the knowledge and experience of an ordinary lay person." *Id*.

In support of their contentions, the parties point to conflicting evidence in the record. Certain evidence may permit an inference that neither Plaintiff's shoulder injury nor her concussion was caused by Defendants' conduct. For instance, medical records from the Legacy Emanuel Emergency Department on the day of the collision note Plaintiff "did not hit her head, did not lose consciousness" and "denies recent trauma or head injury," and do not list any shoulder injuries or pain. ECF 25-11, Ex. K, at 5 (noting Plaintiff "states she has some mild soreness to the left anterior chest, no other areas of pain"). And other medical records and Plaintiff's physical activities indicate that Plaintiff's injuries may have been caused by events

---

[8] *Compare Howerton v. Pfaff*, 246 Or. 341, 343–48 (1967) (requiring expert testimony as to whether collision caused the plaintiff's hernia, where first plaintiff first noticed "the lump" weeks after the accident and was not diagnosed with hernia until about six months after the collision), *and Chouinard*, 179 Or. App. at 513 (requiring expert testimony as to whether a tumor caused the plaintiff's vertigo, nausea, and headaches), *with Ouma v. Skipton*, 267 Or. App. 406, 411 (2014) (requiring no expert testimony as to whether collision caused the plaintiff's tooth injury where the "broken tooth was a discrete injury that an appropriately instructed jury would have no difficulty differentiating from the other claimed injuries" and the jury would not have required the assistance of expert medical testimony to do so), *and Hamilton v. Silven, Schmeits & Vaughan, P.C.*, No. 09-CV-01094-SU, 2011 WL 6888564, at *8 (D. Or. Dec. 23, 2011) ("The causal link between the application of pesticide onto a garden and the subsequent development of temporary skin irritation, rashes, and nausea does not create a complex medical question of the sort that requires expert testimony.").

after, and unrelated to, the collision. *See, e.g.*, ECF 25-11, Ex. K, at 3–4 (noting diagnosis of labrum tear in September 2019); ECF 25-13, Ex. M (noting Plaintiff's various athletic activities after the collision); ECF 25-15, Ex. O, at 2 (reporting concussion from ice chest falling on Plaintiff's head in November 2018).

But other evidence in the record points otherwise. For instance, in her declaration, Plaintiff avers that at the time of the collision, her left arm "felt shaky and very weak" and "was painful and difficult to lift overhead," and that she had bruising on her shoulder following the collision. ECF 29, Bordelon Decl., at ¶ 5. Plaintiff also cites to examination notes from Drs. Paul Puziss and Jordi Kellogg, both of whom concluded that she sustained shoulder injuries during the collision. *See* ECF 32-1, Ex. A, at 7–8 (opining that Plaintiff sustained "left shoulder sprain/strain" and "[u]pper labral tear" in the collision); ECF 32-2, Ex. B, at 2 (opining that Plaintiff's "current complaints," including a left shoulder injury and labral tear, "are reasonably related to" the collision). There is a genuine issue of material fact as to whether the collision caused Plaintiff's alleged shoulder injury.

Whether Plaintiff hit her head during the collision, and, relatedly, suffered a concussion is also a genuine issue in dispute. *Compare* ECF 24 at 12*, with* ECF 28 at 8–9. Despite the hospital records cited by Defendants and a lack of admissible evidence of a diagnosis of concussion,[9]

---

[9] The record contains evidence that Dr. Erika Magill examined Plaintiff and noted symptoms of post-concussive syndrome "that were not diagnosed in the emergency department"—as currently presented, through the report of Dr. Puziss, this evidence is not admissible. *See* ECF 32-1, Ex. A, at 2–3. Additionally, Defendants seek to exclude portions of the expert testimony of Dr. Milam, a chiropractor who examined and treated Plaintiff for "post concussive complaints" and "shoulder pain." *See* ECF 26 at 12–14; ECF 31-1, Ex. A, at 2. Dr. Milam's testimony is relevant to Plaintiff's alleged injuries and their relation to the collision at issue. However, this Court need not address the admissibility of Dr. Milam's testimony to rule on Defendants' motion for partial summary judgment, given the genuine issues of material fact established by Plaintiff's own declaration and the reports of Drs. Puziss and Kellogg, as

Plaintiff declares that she hit her head during the collision, was "confused upon impact and had difficulty focusing," and "had immediate pain at the base of [her] skull/back of [her] neck." ECF 29, Bordelon Decl., at ¶ 6. Neither side is arguing whether hitting one's head can cause a concussion; instead, the dispute centers on whether or not Plaintiff in fact hit her head during the collision. The Court is mindful that the contemporaneous medical records tend to support Defendants' viewpoint and that this is a closer call that the shoulder injury, but Plaintiff's declaration does raise a genuine issue of material fact as to whether she hit her head during the collision and experienced confusion as a result. This issue of causation is not properly decided on summary judgment, but rather at trial or on a motion for directed verdict.

Which testimony and evidence is more credible is for the finder of fact to determine. *See Anderson*, 477 U.S. at 255. Though Defendants contend that "[t]he undisputed facts of this case demonstrate that Plaintiff did not suffer a concussion or a shoulder injury as a result of the [collision]," on this record, drawing all reasonable inferences in Plaintiff's favor, this Court cannot agree. As the record evidence shows, "reasonable minds could differ on the material facts at issue," and therefore, partial summary judgment is not appropriate on the issue of causation. *See Candow*, 2012 WL 5944698, at *2.

## CONCLUSION

For these reasons, this Court DENIES Defendants' Motion for Summary Judgement. ECF 24. This Court DENIES Defendants' Motion to Strike the expert testimony of Dr. Kirkpatrick, and DEFERS ruling as to the expert testimony of Dr. Milam until pretrial motions

---

explained above. Accordingly, this Court defers ruling on the issue of admissibility until it is raised in a *Daubert* motion or motion in limine in advance of trial.

are filed addressing this testimony. ECF 26. This Court DENIES Plaintiff's Motion to Strike the

expert testimony of Mr. Stephens. ECF 28.

**IT IS SO ORDERED**.

DATED this 9th day of May, 2022.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge